# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

———————————————

No. 1D16-1668

———————————————

KISHON LARHAME BIRCH,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

———————————————

On appeal from the Circuit Court for Duval County.
Marianne L. Aho, Judge.

May 25, 2018

KELSEY, J.

On appeal from his conviction for possession of a firearm by a convicted felon, Appellant raises four issues, all of which we reject. We affirm Appellant's conviction and sentence, and write to address two of his arguments: (I) that the charging language was constitutionally defective and precluded the state from pursuing a theory of constructive possession, and (II) that the evidence was insufficient to support a finding of constructive possession.

## I. THE CHARGING LANGUAGE.

### A. *The Information, Verdict Form, and Instructions.*

The state charged Appellant by information with both second-degree murder and possession of a firearm by a convicted felon. Both counts of the information charged that Appellant "actually

possessed" a firearm—language required to invoke the 10-20-Life sentence enhancement. § 775.087(2)(a)1., Fla. Stat. (2012) (requiring that the accused "actually possessed a 'firearm' or 'destructive device'"); *Arnett v. State*, 128 So. 3d 87, 87–88 (Fla. 1st DCA 2013) ("In order to enhance a defendant's sentence under section 775.087(2), the grounds for enhancement must be clearly charged in the information."). The information caption and the charge for felon in possession provided as follows:

INFORMATION FOR:

1)   MURDER IN THE SECOND DEGREE
2)   POSSESSION OF A FIREARM BY A CONVICTED
     FELON
. . .

<u>COUNT 2</u>

KISHON LARHAME BIRCH on May 16, 2012, in the County of Duval and the State of Florida, did actually possess a firearm, to-wit, a handgun, having been convicted of a felony in the courts of the State of Florida, to-wit: Armed Robbery, in the Circuit Court, in and for the Fourth Judicial Circuit of Florida, on December 11, 2003, contrary to the provisions of Sections 790.23(1)(a) [felon in possession] and 775.087(2)(a)(1) [10-20-Life], Florida Statutes.

The verdict form for felon in possession started with "We, the jury, find the defendant guilty of Possession of a Firearm by a Convicted Felon, *as charged in the information*." The "as charged" phrase fuels Appellant's first argument: that the state was limited to pursuing actual possession because the information used the phrase "actually possess" to satisfy 10-20-Life.

On the same page of the verdict form, just below the option of guilty as charged, was a special interrogatory verdict asking whether Appellant did or did not actually possess a firearm during the commission of the offense. This special interrogatory is a mandatory prerequisite to 10-20-Life sentence enhancement, because the enhancement requires the jury to find facts different from the facts necessary to convict of the underlying crime. *See*

2

*Apprendi v. New Jersey,* 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); *State v. Overfelt*, 457 So. 2d 1385, 1387 (Fla. 1984) ("The question of whether an accused actually possessed a firearm while committing a felony is a factual matter properly decided by the jury."), *overruled in part by Washington v. Recueno*, 548 U.S. 212, 221 (2006), *as recognized in Galindez v. State*, 955 So. 2d 517, 522–23 (Fla. 2007); *Banks v. State,* 949 So. 2d 353, 355 (Fla. 4th DCA 2007) ("To impose a three-year mandatory minimum sentence . . . the factfinder must make a specific finding of actual possession.") (quoted in *Arnett*, 128 So. 3d at 87–88).

In contrast to the 10-20-Life sentence enhancement, the crime of felon in possession is not limited to actual possession. The felon in possession statute prohibits convicted felons, among others, from owning or having in their "care, custody, possession, or control any firearm, ammunition," and other weapons or devices. § 790.23(1), Fla. Stat. Thus, "[a] finding of either actual or constructive possession will support a conviction" for felon in possession. *Swain v. State*, 226 So. 3d 1002, 1003 (Fla. 1st DCA 2017); *see also State v. Mulus*, 970 So. 2d 349, 350 (Fla. 3d DCA 2007) (noting courts interpret section 790.23 as meaning possession can be actual or constructive).

A jury can infer constructive possession when the evidence shows a gun was in plain view or the defendant otherwise knew of its presence and had the ability to control it. *Barlatier v. State*, 26 So. 3d 29, 32 (Fla. 3d DCA 2009) (holding presence of gun under driver's seat where defendant was sitting established constructive possession); *Hunter v. State,* 914 So. 2d 985, 986 (Fla. 4th DCA 2005) (holding evidence sufficiently supported constructive possession of a firearm in plain view next to defendant's position in the driver's seat; he knew of its presence and had the ability to control it); *see also Ubiles v. State*, 23 So. 3d 1288, 1291 (Fla. 4th DCA 2010) (holding the state proved constructive possession of marijuana in defendant's vehicle where passenger was smoking it while defendant was driving, and burnt marijuana cigarettes were plainly visible in center ashtray).

3

Consistent with the felon in possession statute and case law holding that either actual or constructive possession will support a felon in possession conviction, this jury was instructed accurately and without objection that "possession" could be either actual or constructive. The instruction defined each form of possession, tracking the pertinent portions of Standard Jury Instruction (Criminal) 10.15, as follows:

> To "possess" means to have personal charge of or exercise the right of ownership, management, or control over.
>
> Possession may be actual or constructive.
>
> Actual possession means
>
> > a.   the [gun] is in the hand of or on [Appellant's] person, or
> >
> > b.   the [gun is] in a container in the hand of or on [Appellant's] person, or
> >
> > c.   the [gun] is so close as to be within ready reach and is under the control of [Appellant].
>
> Mere proximity to an object is not sufficient to establish control over the object when the object is not in a place over which the person has control.
>
> Constructive possession means the object is in a place over which [Appellant] has control, or in which [Appellant] has concealed it.
>
> If an object is in a place over which [Appellant] does not have control, the State establishes constructive possession if it proves that [Appellant] (1) has knowledge that the object was within [Appellant's] presence, and (2) has control over the object.
>
> Possession may be joint, that is, two or more persons may jointly possess an object, exercising control over it. In that

4

case, each of those persons is considered to be in possession of that object.

On the facts presented, we must affirm. As explained in subsections B and C below, we conclude that the information was not defective or fundamentally erroneous, and did not preclude a conviction for either actual or constructive possession. The jury's special interrogatory verdict finding no actual possession under 10-20-Life is not properly extended to preclude guilt of the underlying offense by constructive possession. Point II demonstrates that the evidence of possession was more than sufficient to survive Appellant's motion for judgment of acquittal, and to support the guilty verdict for felon in possession.

## B. *Unpreserved and Not Fundamental Error.*

Appellant did not preserve his present arguments arising from the charging language for possession of a firearm, and cannot show fundamental error. Any defect in the charging instrument did not rise to the level of a deprivation of due process.

The charging paragraph under "Count 2" did not use the word "constructive," and did not recite the statutory language making it unlawful to "own or to have in his or her care, custody, possession, or control" a firearm or other prohibited item. Instead, the information caption designated the charge in Count 2 as "Possession of a Firearm by a Convicted Felon," and the charging paragraph stated that Appellant's actions were "contrary to the provisions of Sections 790.23(1)(a) and 775.087(2)(a)(1)." The word "possess" appears only in the phrase "actually possess," which the State argues was included to satisfy *Arnett*. 128 So. 3d at 87–88. Appellant argues that by charging actual possession as required under *Arnett* to invoke 10-20-Life, the state gave up the right to pursue constructive possession as the basis for a felon in possession charge.

Appellant concedes he did not challenge the adequacy of the information below. His motion for judgment of acquittal made after the state rested, and renewed at the close of evidence, did not distinguish between actual and constructive possession, but argued superficially that there was no evidence that Appellant

had, used, or possessed a firearm. Appellant did not object to the jury instruction on constructive possession, nor to the verdict form. Likewise, his new-trial argument did not distinguish between actual and constructive possession. The alleged error was not preserved.

An unpreserved error is reviewed only for fundamental error, meaning it must "reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." *Brown v. State*, 124 So. 2d 481, 484 (Fla. 1960). Fundamental error in a charging instrument exists only when the alleged defect deprives the defendant of due process. No such deprivation occurs so long as the defendant is on notice of the charges against him, and this requirement is satisfied when the information cites the statute defining the crime. *State v. Burnette,* 881 So. 2d 693, 695 (Fla. 1st DCA 2004) ("An information may withstand an untimely challenge to a technical deficiency (1) where a statutory citation for the crime is given, but all elements are not properly charged, or (2) where the wrong or no statutory citation is given, but all elements of the crime are properly charged.").

A document charging both felon in possession and 10-20-Life sentence enhancement can be written in a variety of ways and still be valid. Here, the information was captioned as "Possession of a Firearm by a Convicted Felon," and the body of the charge cited section 790.23(1)(a), the felon in possession statute. The statute includes all elements of the possession crime, and its citation in the information placed Appellant on notice of the charges against him. *Burnette,* 881 So. 2d at 695. In addition, Appellant was well aware of the evidence supporting each form of possession, from his own personal knowledge as a direct participant in the fatal encounter, from the facts revealed during discovery, from the evidence introduced at trial, and from argument of counsel at trial. This was not a deprivation of due process. We therefore reject Appellant's argument arising out of an alleged defect in the charging information.

6

## C. *10-20-Life Does Not Redefine The Underlying Crime.*

Appellant's other argument arising from the charging language is that the information must be construed as precluding prosecution for constructive possession. Appellant suggests that the jury's acquittal of second-degree murder and its 10-20-Life finding of no *actual* possession preclude guilt of constructive possession. To the contrary, it is analytically incorrect to interpret 10-20-Life charging language as limiting the permissible scope of the prosecution for the underlying crime. The charge, instruction, and interrogatory for 10-20-Life sentence enhancement are analytically distinct from the underlying crime. The state was free to prosecute Appellant for both actual and constructive possession. The jury's separate interrogatory finding of no actual possession "during the commission of the offense" precludes only the minimum-mandatory sentence enhancement under 10-20-Life, not guilt of the underlying possession offense.

By definition, the 10-20-Life sentence enhancement applies only in cases of actual physical possession, not for constructive possession and not through some other theory such as principal. *Kenny v. State*, 693 So. 2d 1136, 1136–37 (Fla. 1st DCA 1997). The sentence enhancement created in section 775.087(1) is not itself a substantive offense or an element of any underlying offense. Even though a connection between the enhancement and underlying crime may seem facially logical, a jury's 10-20-Life finding has no legal bearing on the findings or evidence required to convict of an underlying crime. The statute and case law governing the underlying crime apply to determine whether the state has established guilt of that crime. A special interrogatory verdict such as for 10-20-Life is thus analytically separate from verdicts for underlying crimes, and neither eliminates nor supplies an element of the underlying crimes.

The need to recognize that functional limitation on a 10-20-Life finding, and similar enhancement and reclassification findings, is one reason why it is advisable to present special interrogatories separately from verdicts for underlying crimes. The Florida Supreme Court has advised that, in the course of sequencing charged and lesser offenses in descending order in verdict forms, "[a]ny factor required to be found by the jury for

7

reclassification or enhancement purposes may then [after sequencing charged and lesser offenses by degree] be placed in a separate interrogatory at the appropriate place." *Sanders v. State*, 944 So. 2d 203, 207 (Fla. 2006). The court did not specify what "the appropriate place" is, but the three-Justice concurring opinion suggested that it be a place separate from the verdict form for the substantive offense:

> [T]rial courts should provide an interrogatory *separate from* the verdict form for the core or substantive offenses for the jury to determine the existence of circumstances that can result in mandatory minimum sentences, sentence enhancements, or offense reclassifications. . . . . Substantive or core offenses and the facts supporting reclassifications, enhancements, and mandatory minimum sentences for these offenses *are distinct*. Trial courts instructing juries on lesser included offenses should give instructions and provide verdict forms that comport with this distinction.

*Id.* at 207, 208 (Pariente, J., concurring) (emphasis added); *see also Staten v. State*, 203 So. 3d 169, 2016 WL 5156689, at *1–3 (Fla. 3d DCA 2016) (Emas, J., concurring). Judge Emas "strongly echo[es]" the suggestion of the *Sanders* concurrence that special interrogatories be physically separated from the core verdict forms. *Id.* at *2. He emphasizes that special interrogatories are "not a determination of guilt for the core or substantive offense." *Id.* He recommends separate forms with separate signature lines for the foreperson. *Id.* at *3. His analysis emphasizes the distinction between determinations of guilt of the core offense and the existence of facts necessary for reclassification or mandatory minimum sentences. *Id.*

These cogent analytical observations drive home the point that jury determination of the two issues—guilt and additional circumstances—is a "distinct, sequential task[]." *Sanders*, 944 So. 2d at 208. Likewise, because guilt and reclassification or enhancement are distinct inquiries, we as a reviewing court must not merge the two. Just as jurors are instructed that they must consider separately each crime charged, so too must we respect the legal distinction between separately-charged crimes, and between

8

crimes and sentence reclassifications or enhancements. Applying the proper analysis, we must reject Appellant's argument that the special interrogatory verdict finding no actual possession for purposes of 10-20-Life requires us to vacate the verdict on felon in possession.

## II.   THE EVIDENCE WAS SUFFICIENT TO SUSTAIN THE VERDICT.

Just as a sentence enhancement is analytically distinct from the underlying crime, each crime charged is distinct and involves its own elements. Acquittal of second-degree murder does not require acquittal of felon in possession. Again, while there may be facial logic in tying the two together, as a matter of law they are distinct. If the evidence, viewed in a light most favorable to sustaining the jury's verdict, can satisfy the elements of felon in possession, that verdict must stand regardless of the jury's decision on second-degree murder.

Here, the jury could have acquitted Appellant of second-degree murder by finding that he constructively possessed the gun during the incident, but did not fire the fatal shot. The jury could have found that Appellant did fire the fatal shot but did so by accident. Or the jury could have found that regardless of who pulled the trigger or was holding the gun when it discharged, there was a moment after the victim was shot when Appellant alone had control of the gun. In any such scenario, Appellant was not guilty of second-degree murder, but could have been a felon in possession. Alternatively, as the state argued, the jury could have exercised its power of lenity and found that the state did not prove second-degree murder, but that Appellant had some guilty involvement of a lesser degree, choosing the only other option offered to it. All of these are valid scenarios, and under any of them, Appellant's judgment and sentence must be affirmed.

The evidence established without contradiction that the victim died of a gunshot wound to the head. The barrel of the gun was between her cheek and left molars when the gun discharged. The physical evidence at the crime scene established that Appellant was in the kitchen with the victim before she died, when she was shot, and after she was shot; then fled the scene. The inescapable threshold conclusion from that evidence is that there

9

was a gun in the kitchen and that Appellant was in the kitchen at the same time. It was a small galley kitchen. He could reach it without taking more than a step or two no matter where it was. It was within ready reach. He was there when it discharged, within inches of the victim and facing her. He knew it was there. He could control it.

Appellant is a man, taller and, based on the evidence of the victim's non-lethal injuries, stronger than she was. The forensic evidence established that before she died, the victim sustained impact injuries resulting in bruising on the back of her left arm; under and beside her left eye, resulting in a black eye; over her left cheekbone and teeth; behind her right ear; and ligature marks on her neck consistent with a necklace having been yanked off of her. The bruise on her left cheek was deep, through to the inside of her mouth and all the way down to the bone. The victim's two daughters, ages five and eight at the time, had seen and heard Appellant and the victim fighting—both verbally and physically— throughout the apartment and in the kitchen. They were standing in the kitchen when they saw Appellant "slinging" their mother around. The older girl saw him beating her mother's head on the window. Both girls saw and heard her yelling for him to stop banging her against the window. They saw her pushing him away with both hands. A neighbor boy was playing outside the kitchen and saw the screen from the kitchen window pop out and nearly hit him during the struggle because of something hitting the window from the inside. He immediately went and told his mother they were fighting in the apartment and the victim was "slung into the window and the screen popped out." The girls then saw Appellant push their mother to the floor. This is competent evidence that Appellant had control of the victim and he had control of the place.

The state adduced independent evidence that Appellant possessed a gun. The victim's older daughter testified that she saw Appellant grab her mother, push her to the floor by the stove, and then commit an action that resulted in blood coming from her mother's mouth and neck: "I saw him beating her head on the window. Then that's when she went on the floor. And *he did something by the stove, and then that's when* blood came out of her mouth and neck." The younger girl, only five at the time of the

10

death, testified that she saw Appellant push her mother to the floor and then grab "a small pot" from the stove, containing grease, which he poured "a lot of" on the victim and then it turned into blood. At about this time (working backwards from when Appellant was seen running from the apartment), the neighbors heard a "boom" that caused them to come to the apartment to see what was going on. Although both girls testified that they did not hear a shot or see a gun, the jury was entitled to interpret the girls' descriptions of the crime as the girls' way of depicting the shooting that very obviously did, in fact, occur. Both of them as direct eye-witnesses identified Appellant as having engaged in the actions that resulted in blood pouring out of their mother's mouth and neck. Separate, undisputed evidence identified the causative action as a shooting. That was legally sufficient evidence to allow the jury to convict Appellant of either actual or constructive possession of a firearm.

In addition, there was evidence from which the jury could conclude that shortly before the shooting, Appellant had exclusive access to a box of cartridges from which the fatal bullet could have come. Appellant and the victim had lived together off and on in the victim's apartment. The older girl testified that at one point during the fight, Appellant went in the master bedroom alone and locked the door. She saw her mother pound on the bedroom door and heard her call for him to open it. Law enforcement investigating the scene found the box of cartridges in open view on a closet shelf. The box held 44 cartridges matching the caliber of the bullet found in the victim's head. Although there was only one empty spot in the box, it contained five cartridges that did not match the original contents. The defense argued at trial that the sole empty spot in the box supported a suicide theory; but the same evidence, including the absence of six cartridges matching the caliber of the fatal shot, would equally support the theory that Appellant took from the bedroom one cartridge or a gun containing one or up to all six of the missing cartridges matching the caliber of the fatal bullet.

If we properly interpret and apply the governing law to this evidence, we must conclude that the evidence was legally sufficient to sustain the jury's verdict. We reject as meritless Appellant's remaining arguments, and affirm his judgment and sentence.

11

AFFIRMED.

B.L. THOMAS, C.J., and RAY, J., concur.

———————————————

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

———————————————

Andy Thomas, Public Defender; Maria Ines Suber, Assistant Public Defender, Tallahassee, for Appellant.

Pamela Jo Bondi, Attorney General; Angela R. Hensel and Quentin Humphrey, Assistant Attorneys General, Tallahassee, for Appellee.